UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THOMAS J. JUST,

      Plaintiff,

v.

                              Case No. 09-C-0181

ACCU-TURN, INC.,

      Defendant Third-Party Plaintiff,

v.

DAVID INSURANCE AGENCY, INC. and
WESTPORT INSURANCE CORPORATION,

      Third Party Defendants.

---

DECISION AND ORDER GRANTING ACCU-TURN, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. 67), GRANTING DAVID INSURANCE AGENCY, INC. AND WESTPORT INSURANCE CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. 63) AND DISMISSING CASE

On June 25, 2013, this court conducted a hearing on all pending motions. After the court found no justifiable excuse for plaintiff's delays in complying with discovery requests, the parties reached an agreement regarding responses to outstanding discovery requests. Consequently, David Insurance Agency, Inc. and Westport Insurance Corporation withdrew their motion for sanctions. In addition, the court addressed the three pending summary judgment motions. Attorney Shawn M. Govern conceded that the documents attached to his affidavit were not properly authenticated and that he had failed to establish, as a matter of law, that Accu-Turn was subject to the notice requirements of the Consolidated Omnibus Budget Reconciliation Act (COBRA). The court granted his request to withdraw Thomas Just's motion for summary judgment. Finding no other evidence in the record that would

create a genuine issue of material fact regarding the applicability of COBRA, defendants' motions for summary judgment will be granted.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment shall be granted when there are no disputed issues of material fact and the movant must prevail as a matter of law. "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met. *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 460 (7th Cir. 2010). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the moving party has met its burden, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Id.*, 477 U.S. at 248. In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the

2

non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir. 1998).

FINDINGS OF FACT

Accu-Turn is a machine shop in Union Grove, Wisconsin. (Seater Decl. ¶ 2.) Just's employment with Accu-Turn began on January 2, 1987, when George Seater bought Just's employer, Kreuscher Machining, and renamed the company Accu-Turn. (Just Dep. 63:15-23; Seater Decl. ¶¶ 3, 4.) On January 2, 1987, the same day that Just's employment with Accu-Turn began, Seater appointed Just President and gave him 10 shares of Accu-Turn stock representing 10% ownership in the company. (*Id.* at ¶ 4.) Just's duties eventually comprised supervising the day-to-day operations of Accu-Turn. (Seater Supp. Decl. ¶ 4.) Just remained the President of the company until he left Accu-Turn in May of 2008. (Just Dep. 64:3-20; Seater Decl. ¶ 6.)

Just became enrolled in Accu-Turn's health plan when Seater bought the business. Accu-Turn is the plan administrator of Accu-Turn, Inc. Group Health Plan. (Just Decl. ¶ 20.) Just first became enrolled in Accu-Turn's Group Health Plan in approximately January 2, 1987. (Just Dep. 63: 24-64:3.) At that time, Accu-Turn had five or six employees.[1] (Seater Decl. ¶ 5.) Accu-Turn has always provided health insurance benefits to its employees. (*Id*. at ¶ 7.)

When Just worked for Accu-Turn, he was responsible for disseminating insurance information to Accu-Turn's employees. (Just Decl., ¶ 7.) Just was also the person at

---

[1] Just did not dispute this proposed finding of fact but added that Seater owned a group of companies that employed more than five or six employees. There is no citation to evidence in support of this additional finding as required by the local rules.

Accu-Turn who was responsible for complying with the continuation of coverage requirements for Accu-Turn's health plan. (Just. Dep. 135:18-22.) Moreover, it was Just's job to send terminated employees a letter explaining their continuing health insurance benefits. (Just Dep. 26:7-27:2; Seater Decl. ¶ 20.) Indeed, on September 12, 2007, Just, as President of Accu-Turn, signed an application for a group health plan with Anthem Blue Cross. The application reflects that Accu-Turn had nine-full time employees and two part-time employees. Just estimated that Accu-Turn had ten to twelve employees when his employment terminated in May of 2008. (Just Dep. 17:23 - 18:1, 159:3-159:6.)

Seater trusted Just and left him alone to run the daily operations of Accu-Turn while he ran other businesses. Seater was not involved in running the day-to-day operations of Accu-Turn and never took a salary from the company. (Seater Decl. ¶ 9.) Just understood that as president of the company he was in a position of trust, and knew that it was against Accu-Turn's employment rules for an employee to commit theft. (Just Dep. 87:18-21, 144:14-17.)

Just used Accu-Turn's credit card to pay for personal expenses. (Conway Aff., Ex. B; Just Dep. 45-14-17.) He used Accu-Turn's credit card to pay tuition at Carthage College for his son, Nicholas. (*Id.*) Additionally, Just used Accu-Turn's Elan MasterCard for cash withdrawals and advances, and purchased a 2007 Ford Expedition from Martin Ford Sales, Union Grove, WI, using a combination of his own cash and money charged from Accu-Turn's credit card. (*Id.*) On May 16, 2007, Just purchased two gas grills for approximately $3,160, but sold one of the two grills to Dave Huebler for cash. (*Id.*) Just's wife, son, and daughter, used the Accu-Turn charge account to purchase gas at Bob's Mobile in Union Grove for personal use. (*Id.*) Moreover, Just purchased an artificial Christmas tree for

4

$1,000 on the Accu-Turn business account for use at his home and admitted that he did not talk to Seater about the purchase before he made it. (Just Dep. 48:11-39:3.)

Additional purchases made by Just with the Accu-Turn credit card included a grandfather clock worth several thousand dollars (Just Dep. 49:4-15), a Vermont Teddy Bear (Just Dep. 53:5-12), a sewing machine (Just Dep. 58:2-10), and items from Allied Pools for his personal pool (Just Dep. 58:11-59:33).

Criminal charges were brought against Just alleging four counts of theft-false representation greater than $10,000 in violation of Wis. Stat. § 943.20(1)(d). Racine County Case No. 2009-CF-00031. (Conway Aff., Ex. C.) The criminal charges were resolved through a plea bargain in which Just pled no contest to one count theft false representation greater than $10,000 in violation of Wis. Stat. § 943.20(1)(d), and a dismissal and read-in of the other three counts alleging the same offense. (*Id.*) Just was sentenced to probation for three years and ordered to pay restitution in the amount of $170,000, as a condition of probation. He received jail time of one year and was ordered to serve 90 days with the balance stayed. (Seater Decl. ¶ 16.)

On or about May 13, 2008, Seater left a telephone message for Just indicating that he was accusing Just of wrongdoing. Just returned the call to Seater and left a message stating that he quit. When Seater arrived at Accu-Turn that day, Just was gone. Seater never got the chance to confront Just or ask him questions about the credit card charges. (Seater Decl. ¶ 13.) Seater asserts that he would have fired Just that day had he had the opportunity to confront Just. (Seater Decl. ¶ 15.) Just maintains that he quit because he was "tired of abuse." (Just Dep. 34-36.) Just did not pursue other prospects for

5

employment before he left Accu-Turn (Just Dep. 142:22-24) and the voicemail is what prompted him to quit.

Just testified that he cannot state that he was not provided with an Initial notice upon enrollment. (Just Dep. 148:2-19.) Nevertheless, he admits he was responsible for sending out notices to employees. (Seater Aff. ¶ 32; Just Second Decl. ¶ 2.) Anthem Health Insurance distributed insurance certificates to employees which contained a section on COBRA rights, and the certificates provided an Initial Notice to Just every year beginning in 2007. (Seater Decl. ¶ 34.)

Accu-Turn's Employee Handbook, adopted January 31, 2006, refers to COBRA rights at Section 313 and provided a general notice of COBRA rights to Just as of January 31, 2006. (Seater Decl. ¶ 33.) Moreover, Just was aware of his right to continue healthcare coverage when his employment terminated (Just Dep. 65:12-14) and after Just left Accu-Turn, employees scrambled to fill the responsibilities that Just had done for the past 22 years, including sending notices of continuing coverage to terminated employees. (Seater Decl. ¶ 19.)

Seater's daughter, Mindy Seater, assumed the job of Benefits Coordinator due to Just's abandonment and this was a new position for her. (Seater Decl. ¶ 21.) Mindy Seater and Gwynne Pufahl at Accu-Turn worked with David Insurance to send the insurance notices to Just. (Seater Decl. ¶ 22.) A form entitled "Continuation Coverage Election Notice" was sent to Just on or about June 6, 2008. (Just Dep. 65:4-6.) Afterward, Just signed his intent to continue health insurance coverage with Accu-Turn on June 10, 2008, and elected to continue healthcare coverage for himself, his wife, and his daughters, Taira and Elizabeth. (Just Dep. 65:9-20, Ex. 11.) He paid the premium of $962.47, which

6

was enough to cover his family for one month. (Seater Decl. ¶ 26.) Just's healthcare coverage was continued after his employment terminated as a result of his election to continue coverage. (Just Dep. 65:21-22.) Neither George nor Mindy Seater knew that gross misconduct disqualified employees from entitlement to continuation of health coverage. (Seater Aff. ¶ 23.)

Just was aware that he was responsible to pay his premium for health insurance and that if he didn't pay his health insurance premium his coverage could be cancelled. (Just Dep. 66:20-67:7.) In addition, he acknowledged that Exhibit 11 advised him that he was responsible to have premium payments to his prior employer by the 1st of every month. (Just Dep. 95:25-96:10.) Nevertheless, Just failed to pay the August 2008 premium by the first of the month. (Seater Decl. ¶ 27.) Accu-Turn terminated Just's health insurance on August 1, 2008, when the premium payment was not received by the first of the month. (Just Dep. 67:10-13.)

On October 10, 2008, Just's attorneys wrote Accu-Turn objecting to the termination of coverage and advised Accu-Turn to request that its Plan's insurer reinstate Just's coverage immediately. (Seater Decl. ¶ 28.) On November 7, 2008, Just's health insurance coverage was retroactively reinstated effective June 1, 2008. (Just Dep. 68:24-69:9; Seater Decl. ¶ 29.) Just paid the back premiums for August - November 2008 and coverage was reinstated under the Anthem health insurance policy issued to Accu-Turn. (Seater Decl. ¶ 30.) The period of time that Just did not have health insurance was from August 1, 2008, to November 7, 2008. Just remained continuously insured under Accu-Turn's health coverage through November of 2009. (Seater Decl. ¶ 30.)

7

Case 2:09-cv-00181-CNC   Filed 07/08/13   Page 7 of 13   Document 91

When Just's coverage was reinstated on November 7, 2008, the insurer, Anthem, had an obligation to pay the health insurance claims as though there was no break in coverage. (Just Dep. 71:10-24.) Retroactive reinstatement means that after Just's coverage was reinstated, there was no period for which he actually did not have health insurance coverage. (Just Dep. 71:10-24.) On November 10, 2009, Seater sent Just a letter reminding him that his COBRA benefits were going to terminate effective December 1, 2009, because the 18-month COBRA period expired. (Just Dep. 86:7-9.)

For purposes of this summary judgment motion, it is undisputed that misappropriation of funds from Accu-Turn is a violation of Accu-Turns work rules and an example of gross misconduct in an employment setting. (Just Dep. 88:5-15.) In addition, Just admits that he created the employee handbook, expected that employees knew they could be eligible for benefits continuation upon termination, and knew, years before his own termination, that COBRA coverage was available. (Just Dep. 25:7-23.)

Accu-Turn filed a third-party complaint against David Insurance Agency, Inc., and its insurer, Westport Insurance Corporation alleging that on or about May 14, 2008, Accu-Turn told David Insurance that Just's employment was terminated as a result of its discovery that Just had stolen large sums of money from Accu-Turn. (Doc. 47.) The complaint contends that David Insurance did not advise Accu-Turn that Just's conduct was "gross misconduct" under COBRA that would nullify Just's COBRA rights. Accu-Turn further charges that in early August of 2008, it informed David Insurance that Just had failed to pay his required premium amount for his health insurance.

8

## CONCLUSIONS OF LAW

One of the arguments raised by Accu-Turn and David Insurance Agency and Westport Insurance Corporation on summary judgment is that, on this record, Just cannot establish that Accu-Turn was subject to COBRA. Under the small employer exception, certain employers are excluded from adhering to COBRA's notification requirements:

> b) Subsection (a) of this section shall not apply to any group health plan for any calendar year if all employers maintaining such plan normally employed fewer than 20 employees on a typical business day during the preceding calendar year.

29 U.S.C. § 1161(b).

In support of Accu-Turn's motion, George Seater, Jr., sole shareholder and President of Accu-Turn, filed an affidavit stating that Accu-Turn had five or six employees in 1987 and has never had more than 19 employees in its history. (Doc. 72; Seater Decl. at ¶ 8.) Moreover, during Just's deposition, he testified that on September 12, 2007, he signed an application for a group health plan with Anthem in his capacity as the President for Accu-Turn, indicating that Accu-Turn had nine full-time employees and two part-time employees. He also estimated that Accu-Turn had ten-to-twelve employees when his employment terminated in May of 2008. (Just Dep. 17:23-18:1, 159:3-159:6.) There is no evidence in this record suggesting that Accu-Turn as an entity employed more than twenty people.

Nevertheless, in opposition to summary judgment Just argued that Seater owned a collection of businesses making Accu-Turn part of a controlled group. The definition of "employer" includes corporations that are part of a "controlled group" as defined in Code section 414. 29 U.S.C. § 1167(4). Further, under subsection (b) of 414, "all employees

9

of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a) ...) shall be treated as employed by a single employer." 26 U.S.C. § 414(b). Section 1563(a) describes a brother-sister controlled group, which exists if there are two or more corporations "if 5 or fewer persons who are individuals, estates, or trusts own ... stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation." 26 U.S.C. § 1563(2).

In opposition to summary judgment, Attorney Shawn M. Govern filed an affidavit referencing a letter sent by his law office to Attorney Todd Terry on October 10, 2008, regarding the cancellation of Just's continuation coverage and asserting that the law firm was "aware that Accu-Turn is part of a controlled group of corporations or a group of trades and businesses under common control." (Govern Aff. ¶ 2; Just First Decl. Ex. C.) Govern argued in the hearing that the letter was noteworthy because there was no objection or denial of the assertions in the letter and that Accu-Turn responded to the letter by reinstating COBRA benefits for Just and his family. Further, it was noted that Govern attached to his affidavit what is purportedly the second page of Accu-Turn's Form 1120S 2006 tax return. At schedule B, line 4, there is a check under "yes" to the question of whether the corporation was a member of a controlled group subject to the provisions of section 1561. (Govern Aff. ¶ 3, Ex. A.) Finally, the record includes an individual participant account activity sheet from The Seater Group 401(k) Profit Sharing Plan & Trust

10

which suggests that in 2007 there were more than 20 participants in the plan and trust which was also attached to Govern's affidavit..

On February 14, 2013, Just filed a second declaration stating that he did not become a minority owner in Accu-Turn until January 2, 1987, and, at that time, was not fully aware of all of Seater's business interests in other companies. (Just Second Decl. ¶ 2.) He states that "over time" he became aware that Seater owned the controlling interest in at least three other businesses known as Seater Construction Company, Inc., S&G Specialty Contractors, Inc., Royale House, Inc. and others. (*Id*. at ¶¶ 3,5.) According to Just, Seater Construction Company, Inc., Royal House, Inc., and Accu-Turn employed more than 20 people. (*Id.* at ¶ 4.) However, Just's second declaration does not identify the number of employees at Seater's other companies, or indicate whether, together, Seater's other companies constituted a controlled group subject to the COBRA requirements at any time relevant to Just's claims in this case.

Significantly, during the June 25 hearing Govern conceded that none of the documents attached to his affidavit was properly authenticated. He also conceded that the letter from his law firm, which was attached to Just's second declaration, did not establish that there was a controlled group. Based on these concessions, Govern could not establish as a matter of law that COBRA applied to Accu-Turn and requested to withdraw his motion for summary judgment.

Even assuming Just had submitted admissible evidence, he failed to create a genuine issue of material fact on an issue that he must establish at trial. The single page of the tax return, which was not authenticated, establishes nothing more than Accu-Turn considered itself to be part of a controlled group of corporations during the preceding year.

11

It does not show how many employees were part of that controlled group. That a corporation is part of a controlled group does not mean that there were twenty employees in that controlled group causing it to become subject to COBRA. See 26 U.S.C. § 1543; 29 U.S.C. §§ 1161, 1167. Moreover, the second document identifies participants in the profit sharing plan and trust, but does not indicate whether these individuals were employed at some corporation that was part of a controlled group or whether they were retired, pensioners, or current employees during the year preceding the termination of Just's employment by Accu-Turn. Finally, as discussed above, Just's second declaration never identifies when the controlled group, assuming one exists, reached the requisite number of employees to trigger COBRA or if it ever reached that number during the years relevant to his claims.

On summary judgment, defendants discharged their burden by showing that there was an absence of evidence to support Just's case. *Celotex*, 477 U.S. at 325. The burden then shifted to Just, as the non-moving party, to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Because Just failed to make a showing sufficient to establish that COBRA applied during any time relevant to the initial notice or notice of continuing coverage, Rule 56 mandates the entry of summary judgment. Such a failure necessarily renders all other facts immaterial. *See Celotex Corp.*, 477 U.S. at 322-23. Now, therefore,

IT IS ORDERED that defendant David Insurance Agency, Inc. and Westport Insurance Corporation's motion for summary judgment is granted. (Doc. 63.)

IT IS FURTHER ORDERED that Accu-Turn's motion for summary judgment is granted.

Case 2:09-cv-00181-CNC   Filed 07/08/13   Page 12 of 13   Document 91

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE